# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERRY BEENEY, WENDY BEENEY, NATHAN BENEFIELD, TREVOR COLE, ROBERT COLLINGWOOD, GARY DUTKOWSKI, BILLY E. ROWLES JR., and DARELL UPSHAW, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br>     v.<br><br><br>FCA US, LLC, and STELLANTIS N.V.,<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs Perry and Wendy Beeney, Nathan Benefield, Trevor Cole, Robert Collingwood, Gary Dutkowski, Billy E. Rowles Jr., and Darell Upshaw, by and through their attorneys, individually and on behalf of all others similarly situated, bring this action against Defendants FCA US, LLC ("FCA"), and Stellantis N.V., and allege as follows:

## INTRODUCTION

1.       Plaintiffs bring this class action lawsuit on behalf of themselves other purchasers of new, model-year 2018 and later Chrysler, Jeep, Dodge, Ram, Fiat and Maserati-brand vehicles distributed for sale in the United States by FCA ("Class Vehicles").

2.       Back in the 1950s, Congress highlighted practices in the automotive industry that were harming consumers. Congress identified, in particular, the problem of "phantom freight"—a cost that had been charged by companies like Chrysler (now FCA) and Ford in connection with

the sale of new vehicles. Phantom freight referred to artificially inflating the purported cost of transporting vehicles to dealerships for sale to consumers. Auto manufacturers used that inflated cost to unfairly derive additional revenues that they could not have generated by simply raising the vehicles' sales price.

3.      Thanks to congressional intervention, the practice of charging phantom freight came to a halt by the late 1950s. Pursuant to the Automobile Information Disclosure Act, 15 U.S.C. §§ 1231-33, which took effect in January 1959, companies like FCA are required to place a label—often referred to as a "Monroney Sticker"—on the window of each new vehicle before making it available for sale. The Monroney Sticker lists, among other things, a destination charge, which one Congressman described as the "plain honest-to-goodness figure" that reflects the cost of delivering the vehicle to a dealership for sale. In the midst of congressional scrutiny into phantom freight, Ford and Chrysler publicly announced they were giving up the practice.

4.      In recent years, however, a variety of market realities have emboldened FCA (and perhaps others) to return to the practice of charging phantom freight in connection with new vehicle sales. So-called "destination charges" on FCA vehicles have skyrocketed in recent years in a manner untethered to any actual costs incurred. In a 2021 article, *Consumer Reports* explained that "Destination fees rose an average of 90 percent on Chrysler, Dodge and Jeep vehicles; 74 percent on Ram trucks since 2011; and 114% on Fiats since 2012."[1] The article goes on to quote Dan Bedore, an independent consultant with decades of executive experience at multiple car manufacturers, who succinctly stated: "It does not take a mathematician to understand the value of a $100 increase to a company that sells 2 million units a year." In reality, FCA is charging

---

[1] Mike Monticello, *Sticker Shock: The Truth About Destination Fees*, CONSUMER REP. (2021), https://www.consumerreports.org/buying-a-car/the-truth-about-destination-fees-a1615480982/.

CLASS ACTION COMPLAINT

*hundreds* of dollars more per vehicle for delivery than its competitors.

5.     Plaintiffs and proposed class members bought new Class Vehicles and incurred the phantom freight costs that FCA now systematically charges. Plaintiffs bring this action on behalf of themselves and all other similarly situated Class Vehicle purchasers. Plaintiffs assert claims at common law and for violations of various state consumer protection statutes.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act (CAFA) of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) at least one member of each proposed class is a citizen of a different state than FCA.

7.     This Court may exercise jurisdiction over FCA pursuant to 18 U.S.C. § 1965(b) & (d). FCA is a Delaware limited liability company, which furthermore conducts business in Delaware, distributed for sale in Delaware the Class Vehicles purchased by Plaintiffs, has sufficient minimum contacts in Delaware, and intentionally avails itself of the markets within Delaware through the promotion, sale, marketing, and distribution of its vehicles, thus rendering the exercise of jurisdiction by this Court proper and necessary.

8.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3) because FCA resides in this district, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendants conduct a substantial amount of business in this District. Accordingly, Defendants have sufficient contacts with this District to subject Defendants to personal jurisdiction in this District and venue is therefore proper.

**PARTIES**

**Plaintiffs Perry and Wendy Beeney**

9.      Plaintiffs Perry and Wendy Beeney is a citizen of Illinois and currently resides in Peoria, Illinois.

10.     Plaintiffs purchased a new 2020 Dodge Journey Crossroad on or about February 1, 2021, from Sam Leman Chrysler Jeep Dodge of Peoria, an authorized Dodge dealer and repair center located in Peoria, Illinois. Plaintiff paid a total purchase price of $34,078.60.

11.     When Plaintiffs purchased the subject vehicle, Plaintiffs viewed the Monroney Label affixed to the window.  Plaintiffs referenced the document, a photo of which is depicted below, for the feature and pricing information it contained:



12.     Among other things, the Monroney Sticker referenced a destination charge of $1,495, which in reality, was materially higher than the delivery cost for Plaintiffs' vehicle.

13.    Plaintiffs purchased and used this vehicle for personal, family and/or household uses. Plaintiffs' vehicle bears Vehicle Identification Number: 3C4–PDCGB6LT–269249.

14.    Neither Defendants, nor any of their dealers or other representatives informed Plaintiffs, during or after purchase, of the fact that the destination charge contained phantom freight.

15.    Plaintiffs also purchased a new 2021 Jeep Renegade Trailhawk on or about April 29, 2021 from Sam Leman Chrysler Jeep Dodge of Peoria, an authorized Jeep dealer and repair center located in Peoria, Illinois.  Plaintiff paid a total purchase price of $35,125.

16.    When Plaintiffs purchased the subject vehicle, Plaintiffs viewed the Monroney Label affixed to the window.  Plaintiffs referenced the document, a photo of which is depicted below, for the feature and pricing information it contained:

CLASS ACTION COMPLAINT



17. Among other things, the Monroney Sticker referenced a destination charge of $1,495, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

18. Plaintiffs purchased (and still own) this vehicle, which is used for personal, family and/or household uses. Plaintiffs' vehicle bears Vehicle Identification Number: ZACNJDC10MPM65048.

19. Neither Defendants, nor any of their dealers or other representatives informed Plaintiffs, during or after purchase, of the fact that the destination charge contained phantom freight.

CLASS ACTION COMPLAINT

20.    Additionally, Plaintiffs purchased a new 2022 Ram 2500 Power Wagon on or about December 17, 2021, from Sam Leman Chrysler Jeep Dodge of Peoria, an authorized Dodge dealer and repair center located in Peoria, Illinois.  Plaintiffs paid a total purchase price of $84,805.60.

21.    When Plaintiffs purchased the subject vehicle, Plaintiffs viewed the Monroney Label affixed to the window.  Plaintiffs referenced the document, a photo of which is depicted below, for the feature and pricing information it contained:



22.    Among other things, the Monroney Sticker referenced a destination charge of $1,795, which in reality, was materially higher than the delivery cost for Plaintiffs' vehicle.

23.    Plaintiffs purchased and used this vehicle for personal, family and/or household uses. Plaintiffs' vehicle bears Vehicle Identification Number: 3C6TR5EJ3NG116188.

24.    Neither Defendants, nor any of their dealers or other representatives informed Plaintiffs, during or after purchase, of the fact that the destination charge contained phantom

CLASS ACTION COMPLAINT

freight.

**Plaintiff Nathan Benefield**

25.     Plaintiff Nathan Benefield is a citizen of Missouri and currently resides in Wentzville, Missouri.

26.     Plaintiff purchased a new Dodge 2019 Ram 1500 Laramie on or about April 5, 2019 from Jim Butler Linn Chevrolet, an authorized Dodge dealer and repair center located in Linn, Missouri.  Plaintiff paid a total purchase price of $40,300.

27.     When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window.  Plaintiff referenced the document, an exemplar of which is depicted below, for the feature and applicable pricing information it contained:



28.     Among other things, the Monroney Sticker referenced a destination charge of $1,695, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

29.     Plaintiff purchased this vehicle for personal, family and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 1C6-SRFJT8KN-697716.

30.     Neither Defendants, nor any of their dealers or other representatives informed

CLASS ACTION COMPLAINT

Plaintiff, during or after purchase, of the fact that the destination charge contained phantom freight.

31.    Plaintiff also purchased a new Dodge 2022 Ram 1500 TRX on or about March 3, 2022, from Granger Motors, an authorized Dodge dealer and repair center located in Granger, Iowa.  Plaintiff paid a total purchase price of $79,924.

32.    When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window.  Plaintiff referenced the document for the feature and pricing information it contained.  Plaintiff retained the Monroney Sticker, a photo of which is depicted below:



33.    Among other things, the Monroney Sticker referenced a destination charge of $1,795, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

34.    Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 1C6-SRFU95NN-216101.

35.    Neither Defendants, nor any of their dealers or other representatives informed Plaintiff, during or after purchase, of the fact that the destination charge contained phantom freight.

**Plaintiff Trevor Cole**

36.    Plaintiff Trevor Cole is a citizen of Georgia and currently resides in Lyons, Georgia.

9

37.    Plaintiff purchased a new 2021 Dodge Charger on or about April 5, 2021, from Woody Folsom Chrysler Dodge Jeep Ram, an authorized Dodge dealer and repair center located in Vidalia, Georgia.  Plaintiff paid a total purchase price of $47,800.

38.    When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window.  Plaintiff referenced the document, an exemplar of which is depicted below, for the feature and applicable pricing information it contained:



39.    Among other things, the Monroney Sticker referenced a destination charge of $1,495, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

40.    Plaintiff purchased this vehicle for personal, family and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 2C3-CDXGJ2MH-561072.

41.    Neither Defendants, nor any of their dealers or other representatives informed Plaintiff, during or after purchase, of the fact that the destination charge contained phantom freight.

**Plaintiff Robert Collingwood**

42.    Plaintiff Robert Collingwood is a citizen of Ohio and currently resides in Struthers, Ohio.

43.    Plaintiff purchased a new 2021 Ram 1500 Big Horn on or about January 4, 2021, from Kufleitner Chrysler Dodge Jeep Ram, an authorized Dodge dealer and repair center located in Boardman, Ohio. Plaintiff paid a total purchase price of $44,187.

44.    When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window. Plaintiff referenced the document, an exemplar of which is depicted below, for the feature and applicable pricing information it contained:



45.    Among other things, the Monroney Sticker referenced a destination charge of $1,695, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

CLASS ACTION COMPLAINT

46.    Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 1C6-RRFBG9MN-587986.

47.    Neither Defendants, nor any of their dealers or other representatives informed Plaintiff, during or after purchase, of the fact that the destination charge contained phantom freight.

**Plaintiff Gary Dutkowski**

48.     Plaintiff Gary Dutkowski is a citizen of Pennsylvania and currently resides in Pittsburgh, Pennsylvania.

49.    Plaintiff purchased a new 2021 Ram 2500 Power Wagon on or about January 4, 2021, from Cochran Chrysler Dodge Jeep Ram, an authorized Dodge dealer and repair center located in Natrona Heights, Pennsylvania.  Plaintiff paid a total purchase price of approximately $64, 237.71.

50.    When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window.  Plaintiff referenced the document, a photo of which is depicted below, for the feature and pricing information it contained:

CLASS ACTION COMPLAINT



51.   Among other things, the Monroney Sticker referenced a destination charge of $1,695, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

52.   Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 1GT-P9EED8LZ-342065.

53.   Neither Defendants, nor any of their dealers or other representatives informed Plaintiff, during or after purchase, of the fact that the destination charge contained phantom freight.

**Plaintiff Billy E. Rowles Jr.**

54.    Plaintiff Billy E. Rowles Jr. is a citizen of Texas and currently resides in Lumberton, Texas.

55.    Plaintiff purchased a new 2020 Dodge Ram 1500 Big Horn on or about October 21, 2020 from Winnie Chrysler Dodge Jeep Ram, an authorized Dodge dealer and repair center located in Winnie, Texas.  Plaintiff paid a total purchase price of $48,108.10.

56.    When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window.  Plaintiff referenced the document, an exemplar of which is depicted below, for the feature and applicable pricing information it contained:



57.    Among other things, the Monroney Sticker referenced a destination charge of $1,695, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

58.    Plaintiff purchased (and still owns) this vehicle, which is used for personal, family

and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 1C6-SRFFT6LN-376882.

59.     Neither Defendants, nor any of their dealers or other representatives informed Plaintiff, during or after purchase, of the fact that the destination charge contained phantom freight.

**Plaintiff Darell Upshaw**

60.      Plaintiff Darell Upshaw is a citizen of Florida and currently resides in Perry, Florida.

61.     Plaintiff purchased a new 2018 Dodge Challenger SXT on or about April 25, 2018 from Cass Burch Chrysler Jeep Dodge, an authorized Dodge dealer and repair center located in Valdosta, Georgia.  Plaintiff paid a total purchase price of $29,685.

62.     When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window.  Plaintiff referenced the document, an exemplar of which is depicted below, for the feature and applicable pricing information it contained:



CLASS ACTION COMPLAINT

63.     Among other things, the Monroney Sticker referenced a destination charge of $1,095, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

64.     Plaintiff purchased this vehicle for personal, family and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 2C3-CDZAG7JH-252072.

65.     Plaintiff also purchased a new 2021 Jeep Wrangler Sport on or about June 12, 2021, from Walt's Live Oak Chrysler Jeep Dodge, an authorized Jeep dealer and repair center located in Live Oak, Florida.  Plaintiff paid a total purchase price of $40,533.50.

66.     When Plaintiff purchased the subject vehicle, Plaintiff viewed the Monroney Label affixed to the window.  Plaintiff referenced the document, an exemplar of which is depicted below, for the feature and applicable pricing information it contained:



67.     Among other things, the Monroney Sticker referenced a destination charge of $1,495, which in reality, was materially higher than the delivery cost for Plaintiff's vehicle.

68.    Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. Plaintiff's vehicle bears Vehicle Identification Number: 1C4-GJXAN3MW-685628.

69.    Neither Defendants, nor any of their dealers or other representatives informed Plaintiff, during or after purchase, of the fact that the destination charge contained phantom freight.

**Defendants**

70.    Defendant FCA US, LLC, is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan. The Class Vehicles at issue here are part of the FCA US, LLC, family of companies, which is, in turn, part of Stellantis N.V.

71.    Defendant Stellantis N.V. is a Dutch corporation with its headquarters in Amsterdam, Netherlands.  At present, Stellantis is the ninth largest automaker in the world with annual revenue nearly 100 billion dollars. Below, unless otherwise specified, Stellantis and FCA US, LLC, are referred to collectively as "FCA."

72.    FCA US, LLC, engages in interstate commerce by marketing and distributing vehicles for sale under the Chrysler, Jeep, Dodge, Ram, Fiat and Maserati brands through its authorized dealers located in every state of the United States, including within this District.

**FACTUAL ALLEGATIONS**

**A.  The Mid-20th Century Deception: Price Packing and "Phantom Freight"**

73.    About 70 years ago, Congress diagnosed unfair and deceptive practices that were being used to prey on U.S. consumers. The practices existed in the market for the sale of new automobiles to U.S. consumers. Among them was a practice known as price "packing." 7A Am. Jur. 2d Automobiles § 42 (2022).

74.    As a federal appellate court in the 1960s described it, "Price packing is the practice

of marking up or adding charges over and above the normal recognized markup from the wholesale price at which a dealer purchases a new automobile from a manufacturer." *Baltimore Luggage Co. v. F.T.C.*, 296 F.2d 608, 612 (4th Cir. 1961).

75.     The chief concern pertained to the inflated markup of the charge for transporting new vehicles to dealerships for sale to consumers. This inflated cost was pervasive and problematic enough that it garnered a name, "phantom freight."

76.     Congress held a series of hearings relating to pricing information for automobiles. The hearings were held by the Interstate and Foreign Commerce Committees in both the United States House of Representatives and United States Senate. A number of these hearings discussed the problem of phantom freight.

77.     The hearings involved a great deal of testimony and submissions from various stakeholders, including automobile manufacturers and related trade organizations, automobile dealers and related trade organizations, consumers, the Federal Trade Commission, the Better Business Bureau, the American Automobile Association, and many others.

78.     In a hearing held on July 6, 1955, California Representative Carl Hinshaw explained the problem in a colloquy with Admiral Frederick Bell, Executive Vice President of the National Automobile Dealers Association:

> Mr. Hinshaw.  Admiral, in discussing my bill, which has to do ***with phantom freight***, you point out that ***the packing of freight charges requires the public to pay an inflated and unrealistic fee for freight charges that are not in fact incurred***.
>
> Is that charge made to the dealer first and passed on from the dealer to the consumer, or is it made directly to the consumer?
>
> Mr. Bell.  It is made first to the dealer, sir, and then to the consumer.  The dealer pays cash

on the barrel for his automobiles.

Mr. Hinshaw. And he has to pay that phantom freight in conjunction with the purchase of the automobile. And naturally he passes it on to the consumer.

Mr. Bell. That is correct sir.

*Automobile Marketing Legislation, A Bill to Amend Section 5(A) of the Federal Trade Commission Act With Respect to Certain Unfair Methods of Competition in Connection With the Sale of Motor Vehicles, Hearing on H.R. 528, Before a Subcommittee of the Committee on Interstate and Foreign Commerce*, 84th Cong. (1955) (emphasis added).

79.    The cost to consumers due to manufacturers' charging of phantom freight was massive in the 1950s—even by today's standards. In the hearing excerpted above, Rep. Hinshaw went on to explain, "I was informed by a very substantial person in the automobile business, who did not wish his name to be disclosed, that certainly one large automobile manufacturer claimed that he made between $300 million and $350 million a year on nothing but spurious freight charges." *Id*.

**B. Congress Solves the Problem—Temporarily—in the 1950s.**

80.    Congress's concern about the "inflated and unrealistic fee for freight charges that are not in fact incurred" but are nevertheless "passe[d] on to the consumer," led to legislative action. Congress passed the Automobile Information Disclosure Act of 1958, which led to the now-ubiquitous "Monroney Sticker" that is required to appear on every new vehicle sold in the U.S.

81.    The Monroney Sticker is named for Senator Almer Stillwell "Mike" Monroney, a six-term congressman and three-term senator from Oklahoma. Senator Monroney was a member of the Interstate and Foreign Commerce Committee during the 1950s. In 1955, the Chairman of

the Committee, Warren Magnuson, appointed Senator Monroney to lead the Subcommittee on Automobile Marketing. In the wake of the hearings discussed above, which investigated a number of sharp business practices, Senator Monroney championed and sponsored the Automobile Information Disclosure Act (the "Act").  The Act established uniform disclosure requirements for all new vehicles sold in the United States.

82.    The purpose of the Act is to provide transparency to automobile purchasers in a way that would eradicate unfair practices like charging phantom freight. To advance this purpose, automobile manufacturers are federally mandated to affix a Monroney Sticker on each and every new vehicle, which includes specific and detailed information, including the price for delivery of the vehicle to the dealership.

83.    In the Congressional Record, May 14, 1958, Senator Monroney discussed the purpose of the bill, highlighting the need for transparency, as follows:

This bill, Mr. President, will not compel the manufacturer to do anything except to show the suggested retail price of the car, plus the price of each factory installed accessory and the delivery cost, if any, which was charged to the dealer for the transportation of the car from the factory. ***This will be the delivered price with accessories in a plain honest-to-goodness figure*** on the windshield or window of the car, where every buyer can see it.

104 Cong. Rec. 8700, 1958 (emphasis added).

84.    As Congress intended, domestic automotive manufacturers did in fact capitulate and cease charging phantom freight. In a hearing held on April 24, 1958, Senator Monroney stated, "We know that Ford was the first to abandon phantom freight although they denied there was such a thing, they led the path that got this thing out of the automobile picture." *Automobile Price Labeling, A Bill to Require the Full and Fair Disclosure of Certain Information In Connection*

*With the Distribution of New Automobiles in Commerce, and for Other Purposes, Hearing on S. 3500, Before the Automobile Marketing Subcommittee of the Committee on Interstate and Foreign Commerce,* 85th Cong. (1958).

85.    FCA, then known as the Chrysler Corporation, followed suit—with apparent reluctance. The *New York Times* reported that Chrysler "followed the lead today of its two chief competitors in eliminating so-called phantom freight charges on new cars."[2] The article reported that Chrysler was reducing "[d]estination charges" for its vehicles by as much as $74[3] per vehicle. Concurrently, Chrysler raised the prices of the vehicles by as much as $35 per vehicle.

**C. Auto Manufacturers Such as FCA Have Used "Phantom Freight" Because It Allows Them to Deceptively Inflate the Revenue They Can Generate from New Vehicle Sales.**

86.    The fact that Chrysler in the 1950s—seeking to make up for the fact that it was losing up to $74 per vehicle in abandoned phantom freight charges—was only able to raise vehicle prices by a maximum of $35 per vehicle is illuminating.

87.    The market for new vehicles in the U.S. has long been highly competitive with demand for vehicles turning in large part on the price (typically the MSRP) of those vehicles.

88.    But whereas increases and decreases in the MSRP of new vehicles can be expected to be understood and reacted to rationally by consumers, the charging of phantom freight falls into a group of less transparent practices such as drip pricing and partition pricing. Drip pricing refers to purchases where consumers are first presented with an element of the price upfront—like a new vehicle's MSRP, which is mentioned universally in vehicle marketing and advertising—and then

---

[2] *Chrysler Ends Charge: Follows Rivals in Eliminating 'Phantom Freight' Cost*, N.Y. TIMES (February 29, 1956),
https://timesmachine.nytimes.com/timesmachine/1956/02/29/86534118.html?pageNumber=24.

[3] $74 in 1956 equates to over $700 when adjusted to the present value of a dollar.

learn about compulsory price increments (like a destination charge) later in the buying process. When price is separated in this way, it is also sometimes called partitioned pricing.[4]

89.     It has long been known that the use of drip pricing and partitioned pricing can cause reasonable consumers to misperceive the total costs they will bear as compared to when presented with the same transaction using "all-in" pricing. Companies like FCA can thus cause consumers to perceive the cost of new vehicles as less than it actually is by using surcharges, such as destination charges. This impacts consumers' willingness to pay, their likelihood of purchasing, and their demand.[5]

90.     The destination charge on FCA vehicles is particularly capable of preying on consumer heuristics. Market research has shown that consumers' perceived fairness when it comes to surcharge-increases turns in large part on the purpose of the increase. Because it's generally understood that vehicles need to be transported to dealerships for consumers' benefit, and that the transport is not cost free, consumers perceive as fair the surcharges tied to transporting new automobiles to dealerships. At the same time, they would perceive a comparable surcharge as unfair if it was nominally attributed to something more amorphous, like "dealer preparation" or something else that appeared to be aimed at nothing more than securing extra revenue from the transaction without providing additional benefit.[6] So, by using an inflated destination surcharge, FCA preys on the fact that partition pricing will leave consumers underestimating the full cost of

---

[4] Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. RETAILING & CONSUMER SERV. 696 (2014); *see also* David Adam Friedman, *Regulating Drip Pricing*, 31 STAN. L. & POL'Y REV. 51 (2020).

[5] Eric Greenleaf et al., The Price Does Not Include Additional Taxes, Fees, and Surcharges: A Review of Research on Partitioned Pricing, 26 J. CONSUMER PSYCHOL. 105 (2016).

[6] Vicki Morwitz et al., Divide and Prosper: Effects on Partitioned Prices on Consumers' Price Recall and Demand, 35 J. MARKETING RES., 453 (1998).

the transaction while being duped into perceiving the surcharge as a fair cost of delivery rather than as phantom freight (the only purpose of which is for the company to sneak more profit out of the transaction).

91.    Per Jack Gillis, executive director of the Consumer Federation of America who was quoted by *Consumer Reports*, "There is no reason why destination charges are not incorporated into the cost of the vehicle," and thus the MSRP, "except that it enables the manufacturer to charge more."[7]

92.    Accordingly, as Chrysler's 1950s era practices showed, while the company was misleadingly inflating its prices using phantom freight to the tune of nearly $75 a vehicle, when it was forced to abandon that practice, and it tried to make up for the lost revenue by increasing vehicle prices, it could only raise vehicle prices by less than half of the amount it had been securing as phantom freight.

**D. In Recent Years, FCA Has Again Begun Packing Phantom Freight into Its Pricing by Artificially Inflating the Destination Charges for New Vehicles.**

93.    With decades having passed since the 1950s, the Automobile Information Disclosure Act has evolved since it was signed into law by President Eisenhower in July of 1958. But more than 63 years later, the Act persists. Required disclosures have only increased with time to include information regarding, among other things, fuel efficiency and crash safety.

94.    Although no legislative activity has transpired in the intervening decades suggesting Congress has in any way abandoned the goals of its 1950s efforts, changed circumstances have seen FCA regress back to its use of phantom freight with an evolved scheme.

95.    In addition to companies like FCA developing a better understanding of how to use

---

[7] Monticello, *supra* note 1.

CLASS ACTION COMPLAINT

non-negotiable surcharges to manipulate consumer behavior, the business practices of FCA and its dealerships have changed. Whereas dealerships once paid cash upfront for vehicles, it is now common for them to acquire vehicles on credit, paying FCA after selling the vehicles. One ramification is that dealerships no longer have the same incentives to resist inflated destination charges—they don't bear the cost of those charges in the same way upon taking possession of the vehicles. So, they have little reason to complain as the charges have increased substantially in recent years, recognizing that it is not them, but consumers who pay the costs in the first instance.

96.    Seizing on its ability to manipulate the market in these ways, since at least the 2018 model year, FCA has reengaged in the systematic practice of charging inflated destination charges for Class Vehicles. These newly inflated destination charges reflect a return to the price packing and phantom freight charging that were endemic in the early 20th century.

97.    FCA's destination charges for Class Vehicles are substantially higher than the true cost of delivering the vehicles to dealerships for sale. Rather than charging the true cost of delivery, FCA inflates the charges to generate additional profit for itself through a mechanism that consumers do not understand, and which consumers cannot reasonably protect themselves against (since the charges are misleadingly labeled on Monroney Stickers and are not subject to negotiation as is the base sales price). Just as it did in the early 20th century, FCA is using these inflated destination charges to effectively lower its MSRP, misleading the public into underappreciating the cost of Class Vehicles, and thereby achieving greater revenues. If FCA were to act lawfully, by increasing MSRPs (if desired) and lowering destination charges to eliminate phantom freight, FCA would be unable to charge as much per vehicle and would also decrease the overall demand for its vehicles. Only by engaging in these unfair, deceptive, and unlawful practices is FCA able to sell the volume of Class Vehicles it has sold and at the prices it has sold them.

CLASS ACTION COMPLAINT

98.    *Consumer Reports* reported in its April 2021 issue on the substantially inflated destination charges for Class Vehicles. Per the article, "Destination fees rose an average of 90 percent on Chrysler, Dodge and Jeep vehicles; 74 percent on Ram trucks since 2011; and 114 percent on Fiats since 2012."[8] The following chart from *Consumer Reports* reflecting the average destination surcharges among top manufacturers demonstrates both the concerning industry-wide growth of this inflated fee, and the degree to which FCA (referred to by the parent company name, Stellantis) is winning the race to the bottom:[9]

---

[8] *Id*.

[9] *Id*.

CLASS ACTION COMPLAINT



Destination Charges Are Rising

**Source:** CR analysis of data from © 2021 Autodata Inc. dba ChromeData. All rights reserved.

99.     Although other manufacturers may also have returned to the practice of charging phantom freight, the above chart shows how FCA has inflated its destination charges at rates that are substantially outpacing all other manufacturers. Given the market realities impacting all these manufacturers, none has the incentive to impose destination surcharges in amounts less than the cost to transport their vehicles to dealerships for sale. Indeed, *Consumer Reports* found that destination surcharges among "mainstream automakers" had increased "more than 2.5 times the

CLASS ACTION COMPLAINT

rate of inflation" between 2011 and 2020.[10] Yet FCA consistently charges *hundreds* of dollars more per vehicle than all of the other manufacturers identified by *Consumer Reports*.

100.    In addition to substantially outpacing its competition in ratcheting up destination surcharges, FCA is consistently outpacing inflation. To cite one example, using the Ram 1500 pickup truck as a frame of reference, the rate of increase of the destination charges has substantially outpaced transportation costs generally. The chart below summarizes the destination charge for the last seven years. Over a seven-year period, FCA's destination charges on the Ram 1500 have increased over 50%.

| Model Year | Transportation Fee on Monroney Sticker |
|---|---|
| 2022 | $1,795 |
| 2021 | $1,695 |
| 2020 | $1,695 |
| 2019 | $1,695 |
| 2018 | $1,395 |
| 2017 | $1,395 |
| 2016 | $1,195 |

101.    And the Ram 1500 is no outlier among destination charges on FCA vehicles. Indeed, if anything, it represents a conservative demonstration of the problem. As noted above, of the FCA brands referenced by the *Consumer Reports* article, Ram trucks have seen the most modest increase (74% since 2011). Another FCA model, the Jeep Cherokee, saw its destination charge rise 50 percent during a mere three-year span recently.

---

[10] *Id.*

CLASS ACTION COMPLAINT

102.    Review of publicly available industry transportation costs demonstrates the meteoric rise in FCA destination charges over the last few years, which cannot plausibly be attributed only to price inflation.

103.    One widely recognized measuring stick for transportation costs is the IRS published mileage reimbursement rate. The IRS says the following regarding the rate, "The standard mileage rate for business use is based on an annual study of the fixed and variable costs of operating an automobile."[11] The table below summarizes the rate over the same period as above—2016-2022. The table below demonstrates that from 2016 to 2022, the IRS mileage reimbursement rate has increased just 7.4%. Notably, when prices for transportation dropped, FCA did not drop the price of the destination charge.

| Year | IRS Mileage Reimbursement Rate |
|------|-------------------------------|
| 2022 | 58.5 cents per mile |
| 2021 | 56 cents per mile |
| 2020 | 57.5 cents per mile |
| 2019 | 58 cents per mile |
| 2018 | 54.5 cents per mile |
| 2017 | 53.5 cents per mile |
| 2016 | 54 cents per mile |

104.    In a similar vein, the United States Bureau of Transportation Statistics publishes data concerning Average Freight Revenue per Ton-Mile. From 2016-2020—the most recent data

---

[11] I.R.S. News Release IR-2021-251 (Dec. 17, 2021).

CLASS ACTION COMPLAINT

available—the cost went from 3.99 cents (2016) to 4.40 (2020).[12] This data indicates an increase of just 10.3%.

105.    Trains and trucks are the primary means by which passenger cars and trucks are transported to market for sale. As the foregoing demonstrates, the increases in transportation costs do not remotely reflect the rate of increase in FCA's destination charges for vehicles since 2016.

106.    In the words of a *Consumer Reports* executive, "If [companies like FCA] had a valid reason beyond just driving up the price, they would actually be able to point us toward specific examples of costs that have gone up within the shipping process."[13] With no such explanation given, *Consumer Reports* concludes the ratcheted-up destination charges are "little more than a stealthy way for automakers to raise prices without fully owning up to it."[14]

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

107.    Any applicable statute of limitations has been tolled by FCA's knowing and active concealment of the true cost of transporting Class Vehicles. Through no fault or lack of diligence, Plaintiffs and members of the proposed classes were deceived regarding the destination charge and could not reasonably discover the deception with respect to the destination charge.

108.    Plaintiffs and members of the proposed classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that FCA was misrepresenting or concealing the true cost of transporting Class Vehicles. As alleged herein, the overcharge was and is material to Plaintiffs and members of the proposed classes at all relevant times. Within the

---

[12] U.S. Bureau of Transportation Statistics, Average Freight Revenue per Ton-Mile, https://www.bts.gov/content/average-freight-revenue-ton-mile.

[13] Monticello, *supra* note 1.

[14] *Id*.

CLASS ACTION COMPLAINT

time period of any applicable statutes of limitations, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that FCA was concealing the actual destination charge for the Class Vehicles.

109.    As such, all applicable statutes of limitation have been tolled by FCA's knowing, active, and ongoing affirmative concealment of the facts alleged herein including the actual destination charge.  Plaintiffs and members of the proposed classes reasonably relied on FCA's knowing, active, and ongoing affirmative concealment.

110.    At all times, FCA was and is under a continuous duty to disclose on the Monroney Sticker the actual cost of transporting Class Vehicles to the dealerships where they were sold. Instead, FCA actively concealed the true costs of delivery using the claimed destination charge as a profit center.  Plaintiffs and members of the proposed classes reasonably relied on FCA's misrepresentation and concealment of the facts alleged herein.

111.    Plaintiffs were only able to discover the truth about FCA's practices with respect to the destination charges because of the online publication of the *Consumer Reports* article in February 2021 (and its subsequent print publication in April 2021). Accordingly, the statutes of limitations should be tolled at minimum through the date on which that article was originally published.

112.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and FCA's fraudulent concealment; further, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

113.    Plaintiffs bring this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following

proposed Classes:

Florida Class
*All persons and entities who purchased a new Class Vehicle in Florida.*

Georgia Class
*All persons and entities who purchased a new Class Vehicle in Georgia.*

Georgia's Fair Business Practices Act Class ("GFBPA Class")
*All persons who purchased a new Class Vehicle in Georgia for personal, household, or family purposes.*

Illinois Class
*All persons and entities who purchased a new Class Vehicle in Illinois.*

Illinois Consumer Fraud and Deceptive Business Practices Act Class ("Illinois CFA Class")
*All persons who purchased a new Class Vehicle in Illinois for personal, household, or family purposes.*

Iowa Class
*All persons and entities who purchased a new Class Vehicle in Iowa.*

Iowa Consumer Frauds Act Class
*All persons and entities who purchased a new Class Vehicle in Iowa offered for sale, or sold, primarily for personal, family, or household purposes.*

Missouri Class
*All persons and entities who purchased a new Class Vehicle in Missouri.*

Missouri Merchandising Practices Act Class ("MMPA Class")
*All persons and entities who purchased a new Class Vehicle in Missouri offered for sale, or sold, primarily for personal, family, or household purposes.*

Ohio Class
*All persons and entities who purchased a new Class Vehicle in Ohio.*

Ohio Consumer Sales Practices Act Class ("Ohio CSPA Class")
*All persons who purchased a new Class Vehicle in Ohio for personal, household, or family purposes.*

Pennsylvania Class
*All persons and entities who purchased a new Class Vehicle in Pennsylvania.*

CLASS ACTION COMPLAINT

Pennsylvania Unfair Trade Practices and Consumer Protection Law Class ("Pennsylvania CPL Class")
*All persons who purchased a new Class Vehicle in Pennsylvania for personal, household, or family purposes.*

Texas Class
*All persons and entities who purchased a new Class Vehicle in Texas.*

114.    Excluded from the Classes are FCA, its employees, officers, directors, legal representatives, heirs, successors, parent, subsidiaries, and affiliates; FCA dealers; proposed class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from any class; and governmental entities.

115.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

116.    This action has been brought and may be properly maintained on behalf of the proposed Classes under Federal Rule of Civil Procedure 23.

117.    Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of Class members is impracticable. Defendants sell an average of approximately 2,000,000 Class Vehicles per year in the United States, and the populations of the states of Florida, Georgia, Illinois, Iowa, Missouri, Ohio, Pennsylvania, and Texas are all sufficiently sizable that there are at least thousands of class members within each proposed Class. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

CLASS ACTION COMPLAINT

118.    <u>Commonality and Predominance</u>.  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.  Whether FCA has systematically inflated its destination charges for Class Vehicles, charging substantially more than the actual cost of delivery to dealerships;

b.  Whether the money FCA received in the form of destination charges was required to be used for the benefit of consumers, or used to transport their vehicles to local dealerships;

c.  Whether FCA is obligated to return to consumers the excess amounts it charged in the form of destination charges, which is to say the amounts that went beyond the actual cost of transporting vehicles to dealerships for sale;

d.  Whether FCA's conduct is unfair in that it violates the policy aims of the Automobile Information Disclosure Act and because the harm caused by the conduct outweighs any corresponding benefit;

e.  Whether FCA has been unjustly enriched to the detriment of Plaintiffs and Class members;

f.  Whether FCA's practice of charging phantom freight in the form of "destination charges" constitutes deceptive and misleading conduct;

g.  Whether the hundreds of dollars in excess costs imposed by FCA through its practice of charging phantom freight are material to reasonable consumers; and

h.  Whether Plaintiffs and members of each Class are entitled to equitable relief, including, but not limited to, restitution or injunctive relief.

119.  **Typicality**.  Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of each Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described in this complaint.

120.  **Adequacy**.  Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

121.  **Declaratory and Injunctive Relief.**  Federal Rule of Civil Procedure 23(b)(2): FCA has acted or refused to act on grounds generally applicable to Plaintiffs and members of the Classes, thereby making appropriate final injunctive relief and declaratory relief with respect to the Classes as a whole. Plaintiffs have an interest in buying vehicles in the future, often see marketing for FCA vehicles, and will consider purchasing FCA vehicles in the future if possible, but have no way of determining whether destination charges have been inflated and will thus be unable to rely on the information set forth in Monroney Stickers in the future. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

122.  **Superiority**.  Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Classes to individually

seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**VIOLATIONS ALLEGED**
**COUNT I**
**MONEY HAD AND RECEIVED**
**(Plaintiff Upshaw on behalf of the proposed Florida Class**
**Plaintiff Cole on behalf of the proposed Georgia Class**
**Plaintiff Benefield on behalf of the proposed Iowa and Missouri Classes**
**Plaintiff Collingwood on behalf of the proposed Ohio Class**
**Plaintiff Dutkowski on behalf of the proposed Pennsylvania Class**
**Plaintiff Rowles on behalf of the proposed Texas Class)**

123.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

124.    Plaintiffs Upshaw, Cole, Beeney, Benefield, Collingwood, Dutkowski, and Rowles bring this Count on their own behalf and on behalf of their respective Classes under the law of the state in which they purchased their Class Vehicle(s).

125.    FCA received money that was intended to be used for the benefit of Plaintiffs and the Classes. In particular, FCA charges destination charges for Class Vehicles and thereby derives money intended to benefit Plaintiffs and Class members by paying for the cost of delivering Class Vehicles to dealerships for sale.

126.    FCA failed to use the money for the benefit of Plaintiffs and Class members. As alleged above, rather than charging destination charges to pay for the true cost of delivery, FCA has inflated the destination charges in order to generate additional profit for itself, which it has not

35

spent for the benefit of Plaintiffs and the Classes.

127.    FCA has not returned that money to Plaintiffs or the Classes.

128.    As a result, FCA has received money which belongs to Plaintiffs and the Classes, which in equity and good conscience should be paid over to Plaintiffs and the Classes, but which FCA has instead unlawfully retained.

129.    Plaintiffs and the Classes are therefore entitled to recover the excess money they paid in the form of destination charges because that money was paid by mistake, oppression, or where an undue advantage was taken of Plaintiffs' and Class members' situation whereby money was exacted to which FCA had no legal right.

130.    To the extent this claim is deemed to arise in equity by any state law, for the purpose of the claim brought under that state's law, the corresponding Plaintiff(s) bring this Count in the alternative to any Counts brought for legal remedies and expressly allege that for purposes of this Count they lack adequate remedies at law.

<u>**COUNT II**</u>
**VIOLATIONS OF THE FLORIDA**
**DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**F.S.A. §§ 501.201, *et seq.***
**(Plaintiff Upshaw on behalf of the Florida Class)**

131.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

132.    Plaintiff Upshaw brings this Count on behalf of himself and on behalf of the Florida Class.

133.    Florida's Deceptive And Unfair Trade Practices Act ("FDUPTA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or

practices in the conduct of any trade or commerce …." F.S.A. § 501.204.

134.    At all relevant times, Plaintiff and Florida Class Members were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

135.    FCA's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

136.    FCA's acts and practices relating to destination charges, as alleged in this complaint, constitute unfair and/or unconscionable acts or practices. FCA's practice of employing price packing and charging phantom freight is unethical, unscrupulous, and substantially injurious to new-vehicle purchasers/consumers, and thus constitutes an unfair practice under the FDUTPA. FCA's practice is also unfair because it is contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by the Automobile Information Disclosure Act.

137.    FCA's acts and practices relating to destination charges, as alleged in this complaint, also constitute fraudulent business practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA misrepresents its phantom freight charges as "destination charges" and fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead include additional amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material to reasonable consumers.

138.    As a direct and proximate result of FCA's business practices, Plaintiff and Florida

Class members suffered a loss, because they purchased more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

167. Pursuant to Fla. Stat. Ann. § 501.2105, Plaintiff and the Florida Class seek these damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

## COUNT III
## VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
### Ga. Code Ann. § 10-1-390 *et seq*.
### (Plaintiff Cole on behalf of the GFBPA Class)

139.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

140.    Plaintiff Cole brings this Count on behalf of the GFBPA Class.

141.    Georgia's    Fair    Business    Practices    Act    ("GFBPA")    prohibits any "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce…" Ga. Code § 10-1-393.

142.    FCA's conduct, as set forth herein, occurred in the conduct of a "consumer transaction" within the meaning of the GFPBA. Ga. Code Ann. § 10-1-392(a)(10).

FCA's acts and practices relating to destination charges, as alleged in this complaint, constitute unfair business practices, in violation of the GFBPA.FCA's practice of employing price packing and charging phantom freight is unethical, unscrupulous, and substantially injurious to new-vehicle purchasers, and thus constitutes an unfair practice under the GFPBA. FCA's practice is also unfair because it is contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by the Automobile Information Disclosure Act.

FCA's acts and practices also constitute fraudulent practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive

and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA misrepresents its phantom freight charges as "destination charges" and fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead include additional amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material to reasonable consumers.

143.    Plaintiff and GFPBA Class Members reasonably relied on FCA's misrepresentations regarding "destination charges" paid in connection with the purchase of the Class Vehicles.

144.    FCA's acts and practices, as alleged above, impacted the sale of all Class Vehicles in the Class Period, and therefore have harmed the general public, and pose a continuing harm to the general public.

145.    As a direct and proximate result of FCA's business practices, Plaintiff and GFBPA Class members suffered injury or damages, because they purchased more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

146.    Plaintiff and the GFPBA Class Members also seek attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-390 *et seq.*

## COUNT IV
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 50 5/1, *et seq*., 720 ILCS 295/1A
### (Plaintiffs Perry and Wendy Beeney on behalf of the Illinois CFA Class)

147.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

CLASS ACTION COMPLAINT

148.    Plaintiffs Perry and Wendy Beeney bring this Count on behalf of the Illinois CFA Class.

149.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices….in the conduct of trade or commerce… whether any person has in fact been misled or damaged thereby." 815 ICLS 505/2.

150.    Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

151.    At all relevant times, Illinois CFA Class Members were "consumers" within the meaning of the ILCS. 815 ILCS 505/1 (e)

152.    FCA's acts and practices relating to destination charges, as alleged in this complaint, constitute unfair business practices. FCA's practice of employing price packing and charging phantom freight is unethical, unscrupulous, and substantially injurious to new-vehicle purchasers. The practice is so oppressive that consumers have little choice but to submit to it and it causes consumers substantial injury. FCA's practice is also unfair because it is contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by the Automobile Information Disclosure Act.

153.    FCA's acts and practices also constitute fraudulent practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA misrepresents its phantom freight charges as "destination charges" and fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead include additional amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material

40

CLASS ACTION COMPLAINT

to reasonable consumers.

154.    FCA engaged in these unfair and deceptive acts and practices with intent that Plaintiffs and Class Members rely upon their misleading statements in connection with the sale of the Class Vehicles. Due to FCA's specific and superior knowledge regarding the true "destination charges" incurred in the delivery of the Class Vehicles, its false representations regarding the "destination charges" paid by Illinois CFA Class Members for Class Vehicles, and reliance by Illinois CFA Class Members on these material representations, FCA had a duty to disclose to Illinois CFA Class members the actual "destination charges" incurred in the delivery of the Class Vehicles.

155.    Due to FCA's specific and superior knowledge regarding the true "destination charges" incurred in the delivery of the Class Vehicles, its false representations regarding the "destination charges" paid by Illinois CFA Class Members for Class Vehicles, and reliance by Illinois CFA Class Members on these material representations, FCA had a duty to disclose to Illinois CFA Class members the actual "destination charges" incurred in the delivery of the Class Vehicles.

156.    As a direct and proximate result of FCA's business practices, Plaintiffs and Illinois Class members suffered actual damage, because they purchased more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

157.    FCA's acts and conduct present a continuing risk to Plaintiffs and Illinois CFA Class Members as well as to the general public. FCA's unlawful acts and practices alleged herein affect the public interest.

158.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois CFA Class Members seek monetary relief FCA in the amount of actual damages.

CLASS ACTION COMPLAINT

159.    Plaintiffs and the Illinois CFA Class Members also seek attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

**COUNT V**
**VIOLATIONS OF THE IOWA CONSUMER FRAUDS ACT**
**Iowa Code Ann. §§ 714H.1, *et seq.***
**(Plaintiff Benefield on behalf of the Iowa Consumer Frauds Act Class)**

160.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

161.    Plaintiff Benefield, a natural person, is a "consumer" within the meaning of Iowa Code Ann. § 714H.2.

162.    Plaintiff's Class Vehicle purchased in Iowa constitutes "consumer merchandise," within the meaning of Iowa Code Ann. § 714H.2.

163.    The Iowa Consumer Frauds Act prohibits a variety of unfair, deceptive, and fraudulent practices. Iowa Code Ann. § 714H.3.

164.    FCA's practice of employing price packing and charging phantom freight causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces, and the practice thus constitutes an "unfair practice" under Iowa Code Ann. § 714.16. FCA's practice is also unfair because it is contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by the Automobile Information Disclosure Act.

165.    FCA's acts and practices also constitute fraudulent practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA

knowingly, so as to induce reliance, misrepresents its phantom freight charges as "destination charges" and fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead include additional amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material to reasonable consumers.

166.    As a direct and proximate result of FCA's business practices, Plaintiff and Iowa Iowa Consumer Frauds Act Class members suffered an ascertainable loss of money or property, because they purchased more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

167.    Plaintiff and the Iowa Iowa Consumer Frauds Act Class Members also seek attorneys' fees, and any other just and proper relief available under Iowa Code Ann. § 714H.5.

**<u>COUNT VI</u>**
**VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. §§ 407.010-407.307 (2000) *et seq.***
**(Plaintiff Benefield on behalf of the MMPA Class)**

168.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

169.    Plaintiff Benefield brings this Count on behalf of the MMPA Class.

170.    The Missouri Merchandising Practices Act (MMPA), Mo. Rev. Stat. §§ 407.010-407.307 (2000), *et seq.* makes unlawful the act, use or employment of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression or omission of any material fact in connection with the sale or advertisement of any merchandise. Mo. Rev. Stat § 407.020.1.

171.    Plaintiff Benefield and Class members acted as a reasonable consumer would in light of all circumstances. The methods, acts, and practices by FCA would and did cause

43

reasonable persons to enter into the transactions that resulted in damages.

172.    FCA's acts and practices relating to destination charges, as alleged in this complaint, constitute unfair business practices, in violation of the MMPA. FCA's practice of employing price packing and charging phantom freight is unethical, unscrupulous, and substantially injurious to new-vehicle purchasers, and thus constitutes an unfair practice under the MMPA. FCA's practice is also unfair because it is contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by the Automobile Information Disclosure Act.

173.    FCA's acts and practices also constitute fraudulent practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA misrepresents its phantom freight charges as "destination charges" and fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead include additional amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material to reasonable consumers.

174.    As a direct and proximate result of FCA's business practices, Plaintiff and Missouri Class members suffered an ascertainable loss of money or property, because they purchased more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

175.    Plaintiff and the MMPA Class Members also seek attorneys' fees, and any other just and proper relief available under Mo. Rev. Stat. § 407.025(1).

## COUNT VII
### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
### OHIO REV. CODE ANN. § 1345.01, *et seq.*
### (Plaintiff Collingwood on behalf of the Ohio CSPA Class)

176.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

177.    Plaintiff Collingwood brings this Count on behalf of the Ohio CSPA Class.

178.    Plaintiff Collingwood, and the Ohio CSPA Class Members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 ("Ohio CSPA"), FCA is a "supplier" as defined by the Ohio CSPA, and Plaintiffs' and class members' purchases of Class Vehicles were "consumer transactions" within the meaning of the Ohio CSPA.

179.    The Ohio CSPA provides that "no supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." Oh. Rev. Code § 1345.02.

180.    FCA's practice of employing price packing and charging phantom freight violates the Ohio CSPA's prohibition on unfair acts and practices because: (1) it causes substantial injury to consumers, without offsetting benefits, and which consumers cannot reasonably avoid; (2) it is marked by injustice and  partiality; (3) it is not equitable in business dealings; and (4) it is contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by the Automobile Information Disclosure Act.

181.    FCA's acts and practices also constitute unlawfully deceptive practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA misrepresents its phantom freight charges as "destination charges" and fails to disclose that

the surcharges are not reflective of the actual cost of delivery and instead include additional amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material to reasonable consumers.

182.    Due to FCA's specific and superior knowledge regarding the true "destination charges" incurred in the delivery of the Class Vehicles, its false representations regarding the "destination charges" paid by Ohio CSPA Class Members for Class Vehicles, and reliance by Ohio CPSA Class Members on these material representations, FCA had a duty to disclose to Ohio CSPA Class members the actual "destination charges" incurred in the delivery of the Class Vehicles.

183.    As a direct and proximate result of FCA's business practices, Plaintiff and Ohio CSPA Class members suffered injury, because they purchased more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

184.    The Ohio Attorney General made available for public inspection prior state court decisions which have held that the practices of FCA as detailed above, violate Ohio's Consumer Sales Practices Act.  These cases include, but are not limited to, the following:

   a. *Richardson v. Car Lot Co*., 10 Ohio Misc.2d 32, 10 OBR 539, 462 N.E.2d 459 (1983)
   b. *Charlie's Dodge, Inc. v. Celebrezze,* 72 Ohio App. 3d 744, 596 N.E.2d 486 (6th Dist. 1991)
   c. *Motzer Dodge Jeep Eagle v. Ohio Attorney Gen*., 95 Ohio App. 3d 183, 642 N.E.2d 20 (12th Dist. 1994)
   d. *Burns v. Spitzer Mgmt*., 2010-Ohio-5369, ¶ 19, 190 Ohio App. 3d 365, 941 N.E.2d 1256 (8th Dist. 2010)

185.    Pursuant to Ohio Rev. Code Ann. § 1345.09, Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining FCA's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA.

CLASS ACTION COMPLAINT

## COUNT VIII
### VIOLATIONS OF THE PENNSLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 P.S. § 201-1, *et seq.*
### (Plaintiff Dutkowski on behalf of the Pennsylvania CPL Class)

186.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

187.    Plaintiff Dutkowski brings this Count on behalf himself and the Pennsylvania CPL Class.

188.    Plaintiff Dutkowski and the Pennsylvania Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

189.    FCA's acts alleged herein were perpetrated in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

190.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits fraudulent and deceptive acts and practices, including "[e]ngaging in … fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

191.    FCA's acts and practices constitute fraudulent or deceptive practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA misrepresents its phantom freight charges as "destination charges" and fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead include additional

47

amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material to reasonable consumers.

192.    FCA knowingly engaged in these unfair and deceptive acts and practices with intent that Plaintiffs and Class Members rely upon their misleading statements in connection with the sale of the Class Vehicles

193.    Due to FCA's specific and superior knowledge regarding the true "destination charges" incurred in the delivery of the Class Vehicles, its false representations regarding the "destination charges" paid by Pennsylvania CPL Class Members for Class Vehicles, and reliance by Pennsylvania CPL Class Members on these material representations, FCA had a duty to disclose to Pennsylvania CPL Class members the actual "destination charges" incurred in the delivery of the Class Vehicles.

194.    Plaintiff and Pennsylvania CPL Class Members reasonably relied on FCA's misrepresentations regarding "destination charges" paid in connection with the purchase of the Class Vehicles

195.    As a direct and proximate result of FCA's business practices, Plaintiff and Pennsylvania Class members suffered an ascertainable loss of money or property, because they purchased more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

196.    Pursuant to 73 P.S. § 201-9.2(a), FCA is liable to Plaintiffs and the Pennsylvania CPL Class Members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.

<u>COUNT IX</u>
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT CONSUMER PROTECTION ACT
TEXAS BUS. & COM. CODE § 17.41,** *et seq.*
**(Plaintiff Rowles on behalf of the Texas Class)**

197.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

198.    Plaintiff Rowles brings this Count on behalf himself and the Texas Class.

199.    Plaintiff Rowles and the Texas Class Members are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

200.    Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

201.    Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

202.    The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits an "unconscionable action or course of action by any person." Tex. Bus. & Com. Code § 17.50(a)(2) & (3), Tex. Bus. & Com. Code § 17.4. The Act defines "unconscionable" acts as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5). Under the Act, "false, misleading, or deceptive acts or practices" include, but are not limited to, "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information

been disclosed." Tex. Bus. & Com. Code § 17.46 (24).

203.   FCA's acts and practices relating to destination charges, as alleged in this complaint, constitute an unconscionable act. FCA's practice of employing price packing and charging phantom freight is to consumers' detriment and takes advantage of the lack of knowledge, ability, experience, or capacity of consumers to a grossly unfair degree. The practice is also contrary to legislatively declared and public policies that seek to protect consumers from misleading statements, as reflected by the Automobile Information Disclosure Act;.

204.   FCA's acts and practices also constitute misleading and deceptive practices in that, as Congress recognized in the 1950s, the use of price packing and phantom freight charges is likely to deceive and harm reasonable consumers. The practice is designed to prey on the heuristics of reasonable consumers and to mislead them into underestimating the full cost of Class Vehicles, boosting both overall demand for vehicles and consumers' willingness to pay the prices charged. FCA misrepresents its phantom freight charges as "destination charges" and fails to disclose that the surcharges are not reflective of the actual cost of delivery and instead include additional amounts that FCA adds in to generate additional and hidden profit. The phantom freight charges are material to reasonable consumers.

205.   Due to FCA's specific and superior knowledge regarding the true "destination charges" incurred in the delivery of the Class Vehicles, its false representations regarding the "destination charges" paid by Texas Class Members for Class Vehicles, and reliance by Texas Class Members on these material representations, FCA had a duty to disclose to Texas Class members the actual "destination charges" incurred in the delivery of the Class Vehicles.

206.   As a direct and proximate result, and as a producing cause, of FCA's business practices, Plaintiff and Texas Class members suffered economic damages, because they purchased

more Class Vehicles than they otherwise would have and paid prices they would not otherwise have paid.

207.    Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiff and the Texas Class Members seek an order enjoining FCA unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violation. Pursuant to § 17.50(b)(1), Plaintiff and the Class Members seek attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

**COUNT X**
**UNJUST ENRICHMENT**
**(Plaintiff Upshaw on behalf of the proposed Florida Class**
**Plaintiff Cole on behalf of the proposed Georgia Class**
**Plaintiffs Perry and Wendy Beeney on behalf of the proposed Illinois Class**
**Plaintiff Benefield on behalf of the proposed Iowa and Missouri Classes**
**Plaintiffs Collingwood on behalf of the proposed Ohio Class**
**Plaintiff Dutkowski on behalf of the proposed Pennsylvania Class**
**Plaintiff Rowles on behalf of the proposed Texas Class)**

208.    Plaintiffs incorporate by reference all preceding allegations as though fully Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

209.    Plaintiffs bring this Count on behalf of their respective Classes under the law of the state(s) in which they purchased their Class Vehicle(s), and do so in the alternative to any Counts brought for legal remedies and expressly allege that for purposes of this Count they lack adequate remedies at law.

210.    Plaintiffs and Class members have no contract with FCA. Nevertheless, Plaintiffs and Class members conferred a benefit upon FCA by purchasing Class Vehicles. Although the Class Vehicles are sold by authorized dealers, the destination charge is a direct pass through and FCA directly profits from the sale of each Class Vehicle and the payment for each concomitant destination charge. Plaintiffs and members of the Classes paid FCA for destination charges in amounts that were hundreds of dollars higher than the actual cost of transporting the Class Vehicles

51

to dealerships for sale. Through this practice, moreover, FCA was able to artificially inflate demand for its vehicles, selling a greater volume of Class Vehicles than it otherwise would have.

211.    FCA had knowledge that these improper benefits were conferred upon it.

212.    FCA, having received these benefits, is required to provide remuneration under the circumstances. It is unjust for FCA to retain such monies obtained by the illegal conduct described above. Such money or property belongs in good conscience to Plaintiffs and Class members and can be traced to funds or property in FCA's possession. Plaintiffs' and Class members' detriment and FCA's enrichment are related to and flow from the conduct challenged in this complaint.

213.    Plaintiffs and Class members are entitled to all available restitution and disgorgement of revenues, as it would be inequitable and unjust for FCA to retain such benefits, and other remedies and claims may not permit them to obtain such relief, leaving them without an adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes, respectfully request that the Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

A.    Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Classes, and appointing Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and temporarily and/or permanently enjoining FCA from continuing the unlawful, deceptive, and unfair business practices alleged in this complaint;

C.    A declaration that FCA is financially responsible for providing notice to the Classes

and for administering relief to the Classes;

D.     An order requiring FCA to pay all available monetary relief to the Classes, including in the form of damages, statutory damages, and treble damages, and to repay Class members in the amount of all destination charges it received for Class Vehicles exceeding the cost of delivering those vehicles to dealerships for sale;

E.     An order requiring FCA to pay restitution to the Classes and to be disgorged of its ill-gotten gains;

F.     An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

G.     An award of costs, expenses, and attorneys' fees as permitted by law; and

H.     Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: April 22, 2022          Respectfully submitted,

/s/ Ian Connor Bifferato
Ian Connor Bifferato (DE Bar No. 3273)
**THE BIFFERATO FIRM**
1007 N Orange Street, 4th Floor
Wilmington, DE 19801
Telephone: (302) 429-0907
cbifferato@tbf.legal

William H. Anderson
**HANDLEY FARAH & ANDERSON PLLC**
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (303) 800-9109
wanderson@hajustice.com

CLASS ACTION COMPLAINT

Rosemary M. Rivas (SBN 209147)
David Stein (SBN 257465)
Kyla J. Gibboney (SBN 301441)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
rmr@classlawgroup.com
ds@classlawgroup.com
kjg@classlawgroup.com


Rebecca P. Chang
**HANDLEY FARAH & ANDERSON PLLC**
33 Irving Street
New York, NY 10003
Telephone: (347) 480-1030
Facsimile: (844) 300-1952
rchang@hfajustice.com


Jon M. Herskowitz
**BARON & HERSKOWITZ**
9100 S. Dadeland Blvd.
Suite 1704
Miami, Fl. 33156
Telephone: (305) 670-0101
Facsimile: (305) 670-2393
jon@bhfloridalaw.com


*Attorneys for Plaintiffs and the Proposed Classes*

CLASS ACTION COMPLAINT